**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21 Cr. 35 (RC)** |
| **CLAYTON RAY MULLINS,** | |
| **Defendant.** | REDACTED |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Clayton Ray Mullins to a term of incarceration of 51 months, three years of supervised release, $32,165.65 in restitution, and the mandatory $100 special assessment for the count of conviction.

### I.    INTRODUCTION

The defendant, Clayton Ray Mullins, is 56 years old and runs his own business, Mullins Motors & Used Parts, in Hickory, Kentucky. On January 6, 2021, Mullins participated in the attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than $2.9 million in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts,

Mullins and his co-defendants were violent actors amidst the large mob on the Lower West Terrace ("LWT") of the United States Capitol Building. The mob in this location – and, in particular, Mullins and his co-defendants -- attacked a line of police officers who were positioned in an archway (the "Archway") at the front of a passageway that led to the interior of the building (the "Tunnel"). During the course of this attack, which occurred between 4:27 p.m. and 4:28 p.m., Mullins grabbed an officer's foot and leg and dragged him, as he lay flat on his back on the ground, from the police line at the Archway into the violent mob, where the officer was further attacked with weapons and sustained significant physical injuries.

Even before this assault, Mullins played an active role for hours on the Capitol grounds on January 6th. He was on the front line of rioters attempting to breach, and then successfully breaching, the police line on the West Plaza between 2:07 and 2:27 p.m.; he then helped rioters up to the LWT and directed them towards the Archway between 3:00 to 3:30 p.m.; and, once at the Archway on the LWT, he waved rioters forward and assisted in shoving against the police line inside the Tunnel from 4:16 to 4:21 p.m..

For his behavior on January 6th, 2021, the Government recommends that the Court sentence Mullins to 51 months' incarceration for his conviction of violating 18 U.S.C. § 111(a), a sentence at the top of the advisory Guidelines range of 41 to 51 months, which the Government submits is the correct Guidelines calculation.   Such a sentence reflects the seriousness of Mullins' criminal conduct.

---

but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

## II.      FACTUAL BACKGROUND

### A.  The January 6, 2021 Attack on the Capitol

The Government refers the Court to the stipulated Statement of Offense filed in this case, ECF 356, for a short summary of the January 6, 2021 attack on the United States Capitol by thousands of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.  Background on Rioters' Assault on and Breach of Police Lines on the West Plaza

The outer perimeter of the Capitol Grounds, made up of bicycle-rack style fencing, bore numerous signs stating, "AREA CLOSED – By order of the United States Capitol Police Board[.]" These fences were not actively manned, but members of the USCP were stationed nearby as well as patrolling throughout the grounds.   At approximately 12:45 p.m., a crowd began to gather against the barricades near the Peace Monument, which led to the Pennsylvania Walkway.   At 12:52 p.m., the first breach of the outer perimeter occurred, with several members of the crowd pushing those barricades at the Peace Circle over and advancing into the restricted area to engage with United States Capitol Police ("USCP") officers at the first manned barrier. Less than a minute later, with the crowd already numbering in the hundreds, the handful of USCP police officers in and around the barrier were assaulted and shoved out of the way by the mob. By 12:58 p.m., the rioters had crossed the additional barriers and flooded onto the West Plaza, pushing against the barricade there.



*Image 1: Stills from USCP security footage showing the progression of the crowd, from the outer barricades (top left), to the first manned police barricade (top right), to engaging with USCP at the second manned police barricade (bottom left), and beginning to fill the Lower West Plaza (bottom right).*

The crowd quickly pushed through this fencing and for the next hour and a half, a growing number of police officers were faced with an even faster growing number of rioters in the restricted area, the two sides fighting over the establishment and reinforcement of a police defensive line on the plaza with fists, batons, makeshift projectiles, pepper spray, pepper balls, concussion grenades, smoke bombs, and a wide assortment of weaponry brought by members of the crowd or seized from the inaugural stage construction site.



*Image 2: The breach of the West Plaza barricades (top left) was followed by the formation of a USCP officer wall (top right) until MPD officers arrived with bike rack barriers for a defensive line at the top of the West Plaza stairs (bottom left).   In the photo of the nearly completed bicycle rack barrier line as of 1:39 p.m., a large Trump billboard which would later be used against the police line like a battering ram is visible (bottom right).*

Following the conclusion of President Trump's speech at approximately 1:15 p.m., the crowd began to grow even more rapidly, augmented by those who had walked the mile and a half from the Ellipse to the Capitol. At 2:03 p.m., MPD officers responding to USCP officers' calls for help began broadcasting a dispersal order to the crowd. It began with two blaring tones, and then a 30-second announcement, which was played on a continuous loop:

> This area is now a restricted access area pursuant to D.C. Official Code 22-1307(b). All people must leave the area immediately.   This order may subject you to arrest and may subject you to the use of a riot control agent or impact weapon.

Despite the warning and the deployment of riot control agents and impact weapons, few members of the crowd left. On the contrary, the mob in the restricted area continued to grow as crowds streamed towards the West Front, which looked like a battle scene, complete with an active melee and visible projectiles.

After having actively defended their line for over an hour, the hundreds of officers at the front of the inauguration stage were flanked, outnumbered, and under continuous assault from the

thousands of rioters directly in front of them, as well as members of the mob who had climbed up onto scaffolding above and to the side of them, many of whom were hurling projectiles. Because many of the thousands of people surrounding the officers were not engaged in assaultive conduct, it was difficult for officers to identify individual attackers or defend themselves.

By 2:28 p.m., with their situation untenable and openings in the perimeter having already led to breaches of the building, several large gaps appeared in the police defensive line at the West Front, and a general retreat was called. With their defensive lines extinguished, several police officers were surrounded by the crowd. The rioters had seized control of the West Plaza and the inauguration stage. There were now no manned defenses between the crowd and several entrances into the United States Capitol Building, allowing the stream of rioters that had started entering the building around 2:13 p.m. to build to a torrent.



*Image 3: Breakthroughs in the defensive line on both the left and right flanks (top) caused the entire police line to collapse and individual officers were swallowed by the crowd (middle) and many officers were assaulted as they waited in a group to retreat through doors and stairwells up onto the inaugural stage (bottom).*

### C. Background on Rioters' Assaultive Conduct in the Tunnel Leading to the Doors of the West Front of the U.S. Capitol Building

The fighting in the lower West Terrace tunnel was nothing short of brutal. Here, I observed approximately 30 police officers standing shoulder to shoulder, maybe four or five abreast, using the weight of their bodies to hold back the onslaught of violent attackers. Many of these officers were injured, bleeding, and fatigued, but they continued to hold the line.

*Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges*: Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117  Cong. (July 27, 2021) (Statement of Officer Michael Fanone) available at https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

Many of the most violent confrontations on January 6, 2021, occurred near an entrance to the U.S Capitol Building in the area known as the LWT. The entrance usually consists of a flight of stairs leading to a doorway. On January 6, 2021, however, the construction of the inaugural stage converted the stairway into a 10-foot-wide, slightly sloped, short tunnel that was approximately 15 feet long, *i.e.*, the "Tunnel." That Tunnel led to two sets of metal swinging doors inset with glass. On the other side of the two sets of swinging doors is a security screening area with metal detectors and an x-ray scanner and belt, that leads into the basement of the Capitol Building. The exterior of the Tunnel is framed by the stone Archway, that is a visual focal point at the center of the West Front of the Capitol Building, as circled in red below.



*Image 4[2]*

On January 6, 2021, when rioters arrived at the doors behind this Archway, the outer set of doors was closed and locked, and members of Congress who had fled from the rioters were sheltering nearby. Members of the USCP, assisted by officers from the MPD, were arrayed inside the doorway and guarding the entrance. Many of these officers had already physically engaged with the mob for over an hour, having reestablished a defense line here after retreating from an earlier protracted skirmish on the West Plaza below.

At approximately 2:42 p.m., the mob broke the windows to the first set of doors, and the law enforcement officers reacted immediately by spraying Oleoresin Capsicum ("OC") spray at the rioters, who continued to resist. The mob continued to grow, and the rioters pushed their way into the second set of doors, physically engaging law enforcement with batons, poles, chemical spray, bottles, and other items. Officers created a line in the doorway to block the rioters and in turn physically engaged them with batons and OC spray.

---

[2] Image 4 is taken from "Inauguration at the U.S. Capitol," Architect of the Capitol, https://www.aoc.gov/what-we-do/programs-ceremonies/inauguration.

The violent battle for control over the Archway and the Tunnel continued for more than two hours, during which time rioters repeatedly assaulted, threatened, pushed, and beat law enforcement officers, engaging them in intense hand-to-hand combat. Several officers sustained injuries during this prolonged struggle, and many returned to defend the Capitol, even when injured, as substantial reinforcements for these officers did not arrive until heavily armored Virginia State Police officers joined the police line with additional munitions at around 5:00 p.m. The actions of these officers in thwarting the mob at the LWT entrance potentially saved the lives of others, including members of Congress.

### D.      Clayton Ray Mullins' Role in the January 6, 2021 Attack on the Capitol

Mullins helped create the atmosphere that devolved into violence at the Archway, and then actively joined in that violence. As discussed below, once arrived on the U.S. Capitol grounds, Mullins worked his way to the front line of rioters breaching the West Plaza early in the afternoon; once that police line was breached, he then assisted rioters up to the LWT; once arrived at the LWT, he waived rioters forward and joined in pushing police officers inside the Tunnel; then, during a particularly volatile period on the LWT, Mullins grabbed MPD Officer A.W.'s foot and leg and pulled the officer towards an armed and angry mob of rioters --the assault of conviction here-- and pushed another officer (MPD Officer B.M.), who was attempting to get back to the police line at the Archway, back towards other rioters. Mullins' criminal actions are documented in footage from body-worn cameras ("BWC") worn by MPD officers, USCP closed-circuit video ("CCV") footage, and open-source videos and photographs.

### *Mullins Amongst Front Line of Rioters Breaching the West Plaza*

On the morning of January 6, 2021, Mullins attended the "Stop the Steal" rally that was being held at the Ellipse. From there, he marched towards the Capitol with other individuals. By a

little before 2:00 p.m., Mullins (with slicked-back hair, black jacket, blue jeans and black shoes is circled in yellow below) was amongst the crowd of rioters gathered on the West Plaza, facing off against the police line that had been established there.



*Exhibit 1 (Mullins in the crowd at the West Plaza)[3]*

After he arrived at the West Front, he repeatedly pushed up against other rioters, appearing to purposefully add his weight and force to other rioters, who were themselves pushing into the police line.

Exhibit 2 captures the chaos at the West Plaza when rioters start pushing against the police line at a little after 2:00 p.m. The clip reflects Mullins standing with the mob at the police line on the West Front, pushing against the line multiple times with his fellow rioters, and ultimately finding his way to the front of the police line when it finally breaks at approximately 2:28 p.m.

---

[3] Exhibit 1 is a still image taken from:
https://web.archive.org/web/submit?url=https://video.parler.com/mA/XJ/mAXJK2q00tGs.mp4
Timecode: 0:12.



*Exhibit 2A - Exhibit 2 at 00:04 (Mullins standing before the rioters start pushing into the line)[4]*

About a minute and a half later, the crowd volume increased, with rioters calling out "forward," and Mullins, amongst other rioters, repeatedly pushed forward into the police line.



*Exhibit 2B – Exhibit 2 at 01:39 (Mullins pushing with other rioters into the police line)*

The mob was pushing so hard that it pushed down the metal lamppost, visible on the left of Exhibit 2B. *See* Exhibit 2 at 02:54-03:18.

---

[4] Exhibit 2 is an extract of https://archive.org/details/Cr8gR9nDaXepr7oAk starting at timecode: 1:32:00.



*Exhibit 2C – Exhibit 2 at 02:37 (Mullins pushing at the police line, visible in the background)*

As the rioters pressed forward, attempting to break through the police line, Mullins was sprayed at least once with a chemical irritant. He was not deterred.



*Exhibit 3 (Mullins hit by spray from fellow rioter)[5]*

---

[5]  Exhibit 3 is a still image taken from:
https://twitter.com/RichieMcGinniss/status/1347098465340424195?s=20&t=dacPZSPyonqwqG
8BtzShhw Timecode: 0:32.

By 2:28 p.m., Mullins had positioned himself at the front of the rioters pushing against the police line at the West Plaza. Exhibits 4, 5 and 6 capture approximately the same moment in time when the police line was ultimately breached at the West Plaza. Mullins is clearly visible at the front of the rioters.



*Exhibit 4[6]*

---

[6] Exhibit 4 is a still image taken from :
https://web.archive.org/web/submit?url=https://video.parler.com/bL/zj/bLzjJt5EsDB8.mp4,
timecode 00:00.



*Exhibit 5[7] (Similar scene as Exhibit 4, but zoomed in)*

Within minutes, the rioters gained control of the West Plaza. Mullins placed himself on a stair railing. From there, he assisted other rioters up the stairs, and waved them forward to the LWT:

---

[7] Exhibit 5 can be found at: https://www.gettyimages.com/detail/1230455814



*Exhibit 6 (Mullins standing on the stair railing)*[8]



*Exhibit 7 (Mullins assisting other rioters up the stairs)*[9]

**Mullins Enters the Tunnel**

By 4:06 p.m., Mullins had arrived near the Archway, and by 4:16 p.m., Mullins was at the

---

[8] Exhibit 6 is a still image from:
https://web.archive.org/web/submit?url=https://video.parler.com/yS/O9/ySO9aSEvs0Fx.mp4
Timecode: 0:00.
[9] Exhibit 7 is a still image from: https://www.youtube.com/watch?v=LduLMjy5HRc&t=1558
Timecode: 25:58.

mouth of the Tunnel, waving at other rioters to join him at the front of the Tunnel.



*Exhibit 8 (Mullins waving on other rioters to join him at the Archway)*[10]

Mullins very intentionally moved himself towards the Tunnel entrance. A minute later,

Mullins was captured by the USCP CCV pushing against other rioters to gain entry into the Tunnel:

---

[10] Exhibit 8 can be found at:
https://www.dropbox.com/s/555csdzetc03r3j/20210106_161623.mp4?dl=0
Timecode: 0:04.



*Exhibit 9A - Exhibit 9 at 01:19 (Mullins pushing his way into the Tunnel)*[11]

As the police attempted to push the rioters out of the Tunnel at 4:21 p.m., Mullins clung to the side of the Archway, trying to counter the officers' efforts and get back into the Tunnel.

---

[11] Exhibit 9 is a portion of footage from a US Capitol Police camera in the Tunnel.



*Exhibit 9B - Exhibit 9 at 05:11 (Mullins holding onto the side of the Tunnel with both hands as officers push rioters out)*

Although there is no audio, Mullins gesticulates in the CCV footage, as if to demand that the officers stop pushing and instead move back to allow the rioters back into the Tunnel. *See* Exhibit 9 at 7:06 to 7:10.



*Exhibit 9C - Exhibit 9 at 7:09 (Mullins waving the police back)*

***Mullins Assaults MPD Officers A.W. and B.M.***

After being pushed out of the Tunnel at approximately 4:21 p.m., Mullins did not leave. Instead, he lingered by the Archway. At approximately, 4:27 p.m., Mullins and his co-defendants' actions on the LWT culminated in a brutal 90-second group assault on multiple officers, many of whom sustained significant injuries. By the time these assaults occurred, police officers had been defending the Tunnel for nearly two hours, advancing and retreating as rioters (like Mullins) fought their way into the Tunnel.

The situation escalated considerably at approximately 4:27 p.m. when co-defendant Justin Jersey moved toward the front of the crowd and charged at the line of officers that were positioned in the Archway. Officers A.W., B.M., and C.M. were amongst those officers.

Jersey grabbed Officer A.W.'s baton with one hand and reached towards Officer A.W.'s face and knocked him to the ground. While Officer A.W. was lying on the ground of the Archway, co-defendant Jack Wade Whitton leapt over a fence, kicked at Officer A.W. and struck Officer B.M. and other officers with a crutch multiple times. With the commencement of those assaults,

other rioters surged towards the Archway, throwing objects at the officers, and striking at them with makeshift weapons such as a baton, a hockey stick, a piece of wood, flagpoles, and a police riot shield.   *See* Exhibit 10 at 00:30-1:00.[12]



*Exhibit 10A - Exhibit 10 at 00:51[13]*

As a result of Whitton's assault, Officer B.M. fell to the ground. Once down, Whitton grabbed Officer B.M., first by his baton, then by the helmet and neck of the officer's ballistic vest. Co-defendants Logan Barnhart and Jeffrey Sabol assisted Whitton in dragging Officer B.M. headfirst over Officer A.W., out of the police line and away from the Archway, down the steps in a prone position and into the crowd, where other rioters, including co-defendants Peter Stager and Mason Joel Courson, beat Officer B.M. with a flagpole and a baton. As a result of this attack, Officer B.M. sustained physical injuries including bruising and abrasions.

---

[12] Exhibit 10 is video footage captured by an individual located on the south side of the LWT.

[13] Exhibit 10A is still shot from Exhibit 10 at 00:51. Mullins is circled in blue. Jersey is circled in green. Whitton is circled in red. Barnhart is circled in yellow.

While the focus was on Officer B.M. getting pulled into the crowd, Mullins saw his opportunity. At approximately 4:27 p.m., Mullins (circled in yellow below) leaned over the rail and grabbed Officer A.W.'s leg. In this still, Officer A.W. is lying on the ground on his back as Mullins grabs his leg:



*Exhibit 11A - Exhibit 11 at 0:31 (Mullins leaning over the railing to grab Officer A.W.'s leg)[14]*

In an attempt to get away from Mullins, Officer A.W. sat up and another officer reached for A.W.'s collar to pull him back to the police line. In the still below, Mullins is again circled in yellow, and the other officer's hand (as he attempted to pull back Officer A.W.) is circled in blue.

---

[14] Exhibit 11 is a slowed-down version of Officer C.M.'s BWC. Image 13A is a still image from Exhibit 11 at 0:31.



*Exhibit 11B - Exhibit 11 at 0:35 (Mullins pulling on Officer A.W.'s pant leg as officer grabs Officer A.W.'s jacket to pull him back to the line)*

As the officer attempted to pull A.W. back to the police line, Mullins (circled in yellow) did not let go. Instead, he redoubled his efforts and pulled Officer A.W.'s leg with all of his strength, trying to drag the officer into the crowd:



*Image 11C - Exhibit 11 at 0:38 (Mullins pulling Officer A.W.'s pantleg with both hands)*

While Mullins (circled in yellow) was pulling on Officer A.W.'s right leg, co-defendant

Ronald Colton McAbee (circled in red) grabbed Officer A.W.'s left leg and pulled:



*Exhibit 11D - Exhibit 11 at 0:40 (McAbee leaning over Officer A.W. as Mullins pulls)*

Mullins and McAbee worked in concert to pull the officer down the stairs, even as Officer

A.W. lifted his hand to grab onto one of his fellow officers at the line.



*Exhibit 12A - Exhibit 12 at 0:12[15]  (Mullins and McAbee pulling Officer A.W. away from the police line)*

Pulling in concert, Mullins and McAbee dragged Officer A.W. towards the crowd. *See* Exhibit 11 at 0:30 to 0:51. *See also* Exhibit 12 at 0:05 to 0:15.

McAbee (circled in red below) released A.W.'s left leg to focus his ire on other officers, Mullins (circled in yellow below) continued to pull, attempting to drag the officer into the crowd:

---

[15]    Exhibit 12 is a slowed-down version of Officer D.P.'s BWC. Image 12A is a still image from Exhibit 12 at 0:12.



*Image 13A - Exhibit 13 at 00:19[16]  (Mullins continues to try to pull Officer A.W. into the ground)*



*Image 14A - Exhibit 14 at 00:36[17]  (Mullins turning away, but still pulling on the officer's leg)*

---

[16] Exhibit 13 is video footage captured by an individual located on the south side of the LWT.

[17] Exhibit 14 is a slowed-down version of video footage captured by an individual located on the south side of the LWT.

Mullins only relinquished Officer A.W.'s leg and foot when McAbee and Officer A.W. slid down the stairs into the mob, with McAbee on top of Officer A.W. pinning Officer A.W. to the ground. As he was dragged into the mob, Officer A.W. was kicked, struck with poles, and stomped on by several individuals, while Mullins watched. Officer A.W. also recalled being maced once his gas mask was ripped off. When a third officer, Officer C.M., stepped out of the Archway in an attempt to come to the aid of Officers A.W. and B.M., he was assaulted first by McAbee, then by co-defendant Michael Lopatic.

After he dragged Officer A.W. out of the Archway, Mullins then assaulted Officer B.M., who was struggling to get to his feet and back to the police line. Specifically, after Mullins dragged Officer A.W., Mullins stood up, took a breath and then looked over his right shoulder, further down the steps to where Officer B.M was located. At that time, several individuals were attempting to help Officer B.M. to his feet and up the stairs. Mullins began to yell at those individuals and frantically point back down the steps, towards the rioters. The yellow circle includes both Mullins yelling and pointing back down the stairs at the top of the yellow oval, and Officer B.M. with the helmet and visor regaining his bearings at the bottom of the yellow oval.



*Image 13B (Exhibit 13 at 00:56)*

When the men continued to try to get Officer B.M. back to the police line at the Archway up the stairs, Mullins reached out with his right arm, and pushed Officer B.M. on the head back down the steps. *See* Exh. 14 at 1:50 to 2:02. The close-up below captures Mullins' black-gloved hand shoving Officer B.M.'s helmeted head back down the stairs towards the rioters (yellow square).



*Exhibit 13C - Close-up of Exhibit 13 at 01:00*

After spending almost three hours on the West Plaza and LWT pushing against police lines, waving fellow rioters towards the police line, plunging into the Tunnel with his fellow rioters, and assaulting police officers, Mullins finally left the U.S. Capitol grounds at approximately 4:45 p.m.

*Officer A.W.'s Injuries*

With the assistance of another individual in the mob, Officer A.W. was able to make his way back to the Archway. Once back in the Tunnel, another officer realized that Officer A.W. was bleeding profusely from his head. Officer A.W. was escorted to the east side of the Capitol building before being taken to the hospital. At the hospital, Officer A.W. was treated for a laceration on his head, which required two staples to close. He also sustained bruising on multiple areas of his body, including contusions on his elbow. Due to his injuries, Officer A.W. was off duty until May 2021, when he returned to limited duty. Officer A.W. returned to full duty after six months, in July 2021.

### E.  THE CHARGES AND PLEA AGREEMENT

On November 17, 2021, a federal grand jury returned a third superseding indictment, charging twenty-four counts against nine defendants. ECF 145. The indictment charged Mullins in six of the counts:

- Count Nine: violation of 18 U.S.C. § 111(a)(1) and (b) and § 2 (Assaulting, Resisting, or Impeding Certain Officers or Employees and Inflicting Bodily Injury, and Aiding and Abetting);

- Count Eleven: violation of 18 U.S.C. § 111(a)(1) (Assaulting, Resisting, or Impeding Certain Officers or Employees);

- Count Fourteen: violation of 18 U.S.C. § 231(a)(3) (Obstruction of Law Enforcement During Civil Disorder);

- Counts Twenty-One, Twenty-Two, and Twenty-Three: violations of 18 U.S.C. §§ 1752(a)(1), (2), and (4) (Knowingly Entering or Remaining in any Restricted Building or Grounds, Disorderly and Disruptive Conduct in any Restricted Building or Grounds, and Engaging in Physical Violence in any Restricted Building or Grounds); and

- Count Twenty-Four: violation of 40 U.S.C. § 5104(e)(2)(F) (Violent Entry and Disorderly Conduct on Capitol Grounds).

On, September 6, 2023, Mullins pleaded guilty, pursuant to a plea agreement, ECF 355, to a lesser included offense of Count Nine – 18 U.S.C. § 111(a)(1), the assault of Officer A.W.

### F.  STATUTORY PENALTIES

Mullins now faces sentencing on one count of violating 18 U.S.C. § 111(a)(1).  As noted in the Plea Agreement and the Presentence Report issued by the U.S. Probation Office, Mullins faces up to eight years of imprisonment, a term of supervised release of not more than three years,

a fine up to $250,000 or twice the gross pecuniary gain or loss of the offense (whichever is greatest), and a mandatory special assessment of $100.

## G.  THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

### A.  U.S. Probation Office and Government's Guideline Calculations

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). The parties have agreed to the following Guidelines, as set forth in the plea agreement:

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a)[18] | Base Offense Level | **14** |
| U.S.S.G. § 2A2.2(b)(3)(B) | Bodily Injury | **+3** |
| U.S.S.G. § 3A1.2(a)-(b) | Government Official Victim; | **+6** |

The government recommends the following enhancement, pursuant to U.S.S.G. § 3A1.3, as explained further below; however, as per the plea agreement, Mullins reserved the right to contest that enhancement:

| | | |
|---|---|---|
| U.S.S.G. § 3A1.3 | Restraint of the Victim | **+2** |
| | **Adjusted Offense Level:** | **25** |
| U.S.S.G. § 3E1.1(a)-(b) | Acceptance of Responsibility | **<u>-3</u>** |
| | **Total Offense Level:** | **22** |

*See* Plea Agreement ¶ 5A. Probation calculated the same adjusted and total offense levels as the government, but arrived at these numbers differently. Probation applied a 5-level enhancement for

---

[18] § 2A2.2 applies here because Mullins' conduct involved aggravated assault. *See* U.S.S.G. § 2A2.4(c)(1). Aggravated assault "means a felonious assault that involved (A) a dangerous weapon with intent to cause bodily injury (i.e., not merely to frighten) with that weapon; (B) serious bodily injury; (C) strangling, suffocating, or attempting to strangle or suffocate; or (D) an intent to commit another felony." U.S.S.G. §2A2.2 cmt. n.1. Here, Mullins' assault was felonious (punishable as a felony) and involved the intent to commit another felony, specifically, obstructing, impeding, and interfering with a law enforcement officer lawfully engaged in the performance of his official duties during a civil disorder, in violation of 18 U.S.C. § 231(a)(3).

serious bodily injury under U.S.S.G. § 2A2.2(b)(3)(B), but did not apply the 2-point enhancement for restraint of victim under U.S.S.G. § 3A1.3. *See* PSR ¶¶ 60-69.

The U.S. Probation Office calculated Mullins' criminal history as category I, which is not disputed. PSR ¶ 72. Accordingly, the U.S. Probation Office calculated Mullins' total adjusted offense level, following a three-level downward adjustment for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a) and (b), as 22, and his corresponding Guidelines imprisonment range as 41-51 months. PSR ¶ 109.

Recent amendments to the Sentencing Guidelines for 2023 include a new Guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. Section 4C1.1 will be in effect at the time of sentencing in this matter, but was not considered at the time the parties entered into the plea agreement. Section 4C1.1 does not apply in this case, as Mullins used violence in connection with this offense, in violation of 4C1.1(a)(3). The government is aware of at least three cases in which courts have rejected the application of § 4C1.1 to January 6 defendants who engaged in violence. *United States v. Gundersen*, 21-cr-137 (RC), *United States v. Baquero*, 21-cr-702 (JEB) and *United States v. Dillard*, 23-cr-49-JMC. If the Court declines to apply § 4C1.1, the government requests that the Court make clear at sentencing that it would have imposed the same sentence regardless of whether § 4C1.1 applies.

**B. The Restraint of the Victim Enhancement Pursuant to U.S.S.G. § 3A1.3 is Proper**

The Plea Agreement allows Mullins "[t]o challenge the application of U.S.S.G. § 3A1.3 solely on the grounds that his offense did not involve the victim being physically restrained in the course of the offense." Plea Agreement, at ¶ 5(A). For the reasons set for below, the facts of this case firmly support the application of the enhancement.

The Guidelines provides for a two-level, victim-related upward adjustment "[i]f a victim was physically restrained in the course of the offense." U.S.S.G. § 3A1.3. "'Physically restrained' means the forcible restraint of the victim *such as* by being tied, bound, or locked up." U.S.S.G. § 1B1.1, cmt. n.1(L) (emphasis added). "[T]he use of the modifier 'such as' in the definition of 'physical restraint' found in § 1B1.1... indicates that the illustrations of physical restraint are listed by way of example rather than limitation."). *United States v. Drew*, 200 F.3d 871, 880 (D.C. Cir. 2000) (quoting *United States v. Anglin*, 169 F.3d 154, 163 (2d Cir. 1999)); *see also United States v. Bell*, 947 F.3d 49, 55 (3d Cir. 2020) ("[W]e, along with many of our sister circuits, have held that the three examples provided in the definition of physically restrained are not an exhaustive list, but rather only examples of the types of conduct that fall within the meaning of the term [physically restrained].") (collecting cases from the First, Second, Third, Fourth, Fifth, Ninth, and D.C. Circuits).

The Federal Courts of Appeals have adopted varying approaches to determining whether the victim was "physically restrained" for purposes of Section 3A1.3. *See United States v. Taylor*, 961 F.3d 68, 78 (2d Cir. 2020) (discussing the approaches taken by the Second, Third, Seventh, and Ninth Circuits). The Third Circuit developed an approach incorporating various considerations adopted by other Courts of Appeals, including a consideration addressed by the D.C. Circuit, which itself currently has a dearth of caselaw on physical restraint under the

Guidelines. *Bell*, 947 F.3d at 56 ("[W]e discern five broad factors that the other circuits have used to evaluate whether the enhancement should be applied and that we, after consideration, adopt here").   The five factors identified by the Third Circuit in *Bell* are: (1) use of physical force; (2) exerting control over the victim; (3) providing the victim with no alternative but compliance; (4) focusing on the victim for some period of time; and (5) placement in a confined space. *Id*.[19]   These factors should be balanced, and no single factor is dispositive. *Id*.

    1.   <u>Mullins used physical force on Officer A.W.</u>

"[P]hysical restraint requires the defendant either to restrain the victim through bodily contact or to confine the victim in some way." *Drew*, 200 F.3d at 880 (finding no physical restraint pursuant to U.S.S.G. § 3A1.3 where the defendant ordered his victim to leave her bedroom and walk downstairs at gunpoint, because "[t]he required restraint must, as the language plainly recites, be physical") (citing *United States v. Harris,* 959 F.2d 246, 265 (D.C. Cir. 1992) *abrogated on other grounds by United States v. Stewart*, 246 F.3d 728 (D.C. Cir. 2001)). Here, Mullins made direct bodily contact with Officer A.W. when he grabbed the officer's foot and leg, twice, and dragged him away from the police line.

Similar kinds of bodily contact have been found to involve physical restraint under the Guidelines. *See, e.g., United States v. Plenty*, 335 F.3d 732, 735–36 (8th Cir. 2003) (Section 3A1.3

---

[19]  The Third Circuit in *Bell* addressed a two-level enhancement for physical restraint pursuant to U.S.S.G. § 2B3.1(b)(4)(B) which reads, "[I]f any person was physically restrained to facilitate commission of the [robbery] offense or to facilitate escape, increase by 2 levels." U.S.S.G. § 2B3.1(b)(4)(B). This enhancement varies a bit from § 3A1.3, which applies "[i]f a victim was physically restrained in the course of the offense." U.S.S.G. § 3A1.3. The Chapter 2 Guideline imposes an additional requirement that the restraint must be imposed "to facilitate commission of the offense [of robbery] or to facilitate escape." *Bell*, 947 F.3d at 60. However, since the Chapter 2 enhancement in *Bell* also refers to "physically restrained" as defined in U.S.S.G. § 1B1.1 (*see Bell*, 947 F.3d at 54–55), *Bell* and similar cases help interpret the meaning of "physically restrained."

victim restraint adjustment applied where the defendant dragged the victim by her ankle from her bedroom to her living room, and then dragged her by her hair to the doorway of the house); *United States v. Foppe*, 993 F.2d 1444, 1452–53 (9th Cir. 1993) (defendant forcibly restrained two women when he held up a bank by dragging one woman by the neck to a teller station while pushing a hairbrush into her back, pretending it was a gun); *see also United States v. West*, No. 20-3723, 2022 WL 321136, at *1 (8th Cir. Feb. 3, 2022) (unpublished) (§ 3A1.3 restraint enhancement was applicable when defendant grabbed the victim around the neck to prevent the victim from leaving the hotel room).

Mullins' conduct falls within even the narrowest interpretation of restraining the victim through "bodily contact."

2. <u>Mullins exerted control over Officer A.W.</u>

To restrain, a defendant should be deemed to have engaged in actions that restrict a victim's freedom of movement in some manner. *Bell*, 947 F.3d at 57; *see also Taylor*, 961 F.3d at 78 ("'Restraint' is principally defined as 'to hold back; to check; to hold from action, proceeding, or advancing'") (internal citations omitted); *Foppe*, 993 F.2d at 1452–53 ("The dictionary defines 'restraint' as (1) the act of holding back from some activity or (2) by means of force, an act that checks free activity or otherwise controls… 'Forcible' means effected by the use of force") (internal citations omitted); *see, e.g., United States v. Roberts*, 898 F.2d 1465, 1470 (10th Cir. 1990) ("We have no difficulty in concluding that a victim who is held around the neck at knifepoint is denied freedom of movement so as to be physically restrained [pursuant to § 3A1.3]."). Dragging a victim from one location to another, while they struggle to break free and escape, forcibly denies the victim such freedom of movement. *See, e.g., Plenty*, 335 F.3d at 736

(defendant "exercise[ed] control over [the victim] that prevented her freedom of movement when he dragged [her] off the bed and through the house").

Here, Mullins restricted Officer A.W.'s freedom of movement by dragging him as he lay prone on the ground, towards the violent mob. Mullins' actions prevented Officer A.W. from being able to defend himself or return to the safety of his fellow officers still holding the line in the Archway. Accordingly, Mullins restricted Officer A.W.'s freedom of movement and exerted control over Officer A.W.

3.   Mullins provided Officer A.W. with no alternative but compliance.

In *United States v. Rosario*, 7 F.3d 319 (2d Cir. 1993), the Second Circuit affirmed the application of a Chapter 2 enhancement for the use of physical restraint in a robbery where the defendant stood on his victim's throat (pinning him to the ground by his neck) while stealing the victim's wallet and keys, and the victim "could do nothing about [his] situation because of the physical restraint." *Id.* at 320-21 (internal citations omitted).

Here, Mullins' restraint caused Officer A.W. to be vulnerable and prevented Officer A.W. from defending himself. Officer A.W. was dragged towards the crowd on his back. Officer A.W. was also being struck by other rioters while he was being dragged, which further limited his ability to defend himself. Mullins's restraint forced Officer A.W. to comply with exactly what Mullins and the riotous mob wanted—for officers to be dragged away from the police line in the Archway, so that rioters would have a better chance to successfully enter the Capitol Building. And like the victim in *Rosario*, Officer A.W. could do nothing about his situation because of the physical restraint being applied to him. There is no question that Officer A.W. was in a dangerous and precarious situation as Mullins dragged Officer A.W. further away from fellow officers who could have helped him. Mullins left Officer A.W. with no alternative but compliance.

4.   <u>The brief duration of the restraint does not preclude application of the enhancement.</u>

The duration of the restraint, albeit brief, should not dissuade the Court from applying the enhancement, as sustained restraint is not required. *See, e.g., United States v. Coleman*, 664 F.3d 1047, 1050–51 (6th Cir. 2012) ("We likewise reject [the defendant's] 'sustained focus' requirement"); *United States v. Checora*, 175 F.3d 782, 791 ("[W]e conclude that a physical restraint occurred, within the meaning of section 3A1.3, when [two defendants] tackled [the victim] to the ground to prevent his escape… The fact the restraint of [the victim] was brief does not alter our conclusion."); *Foppe*, 993 F.2d at 1452– 53 ("The Guidelines do not distinguish between long and short-term restraint, and neither will we"); *see also United States v. Rowsey*, 431 F. Supp. 2d 903, 907–09 (N.D. Ind. 2006) (victim of a bank robbery was physically restrained even though the duration of the restraint was only about two minutes, because "[i]t is the fact of restraint-not the duration thereof-that is controlling").

In any event, even under the Third Circuit's *Bell* analysis, the duration of the restraint is only one factor and should be balanced against the other factors used to determine whether a victim was "physically restrained" under the Guidelines. *Bell*, 947 F.3d at 56. "No single factor is dispositive nor does any factor carry more weight than any other factor; rather, district courts should balance all of these factors." *Id.* at 60. Here, while Mullins' restraint of Officer A.W. was brief (it lasted about 20 seconds), context matters greatly. Not only did Mullins grab the officer and tempt to drag him to another more dangerous location, but this restraint occurred in the middle of a riot—Mullins' holding and dragging of Officer A.W. left the officer vulnerable to additional assaults, as he was surrounded by other hostile rioters. Thus, although the duration of the restraint was brief, it coincided with the moment when Officer A.W. was most vulnerable. Consequently, the brevity of the restraint should not preclude application of the enhancement.

5. <u>Mullins, in conjunction with the rioting crowd, placed Officer A.W. in a confined space.</u>

The final consideration is whether "the perpetrator's act… enclose[es] or confin[es] the victim in a space or with a barrier, actual or threatened." *Bell*, 947 F.3d at 60 (internal quotation marks and citations omitted).

Mullins dragged Officer A.W. towards a stairwell and an angry and violent mob of people who surrounded him and prevented him from escaping. Such behavior—blocking escape—is also considered in determining that a victim was "physically restrained" pursuant to U.S.S.G. § 3A1.3. For instance, in *United States v. DeLuca*, 138 F.3d 24 (1st Cir. 1998) the court found that the victim was "physically restrained" by two of the defendant's co-conspirators where one co-conspirator "pushed [the victim] as he attempted to leave the hallway in which he was being assaulted and [another co-conspirator], throughout the encounter, stood at the hallway door barring egress by [the victim]." The court concluded that the victim was confined even though he was never "tied, bound, or locked up," because "[t]he examples listed in the guideline definition of 'physically restrained' [in U.S.S.G. § lBl.1, comment. (n.1 (i))] are merely illustrative . . . not exhaustive." *Id*. at 39.  Mullins dragged Officer A.W. to a space where the rioters could successfully confine the officer.

6. <u>Application of the enhancement punishes conduct that is not inherently part of the offense of conviction.</u>

The restraint enhancement should not be applied where either "the offense guideline specifically incorporates this factor" or "where the unlawful restraint of a victim is an element of the offense itself (*e.g.*, this adjustment does not apply to offenses covered by §2A4.1 (Kidnapping, Abduction, Unlawful Restraint))." U.S.S.G. § 3A1.3 cmt. n. 2. In order to determine whether "restraint" is an element of the offense, courts look to the statutory definition of the offense.

*United States v. Benitez-Torres*, 73 F. App'x 78 (5th Cir. 2003) (citing *United States v. Gaytan*, 74 F.3d 545, 560 (5th Cir. 1996)). When conducting this inquiry, courts should consider whether "the act of physical restraint 'adds to the basic crime.'" *United States v. Wilson*, 198 F.3d 467, 472–73 (4th Cir. 1999).   Courts "must determine whether the offense *conduct* specifically addressed whether the victim was physically restrained" in determining whether a Guideline enhancement incorporates the victim restraint adjustment. *United States v. Troup*, 426 F. Supp. 3d 1072, 1136 (D.N.M. 2019) (quoting *United States v. Joe*, 696 F.3d 1066, 1071 (10th Cir. 2012) (emphasis in original).

Here, the only specific offense characteristic under Section 2A2.2 is for bodily injury under Section 2A2.2(b)(3)(A). That means that Mullins' restraint of Officer A.W. is not accounted for by application of Section 2A2.2, or by any other enhancement, for that matter. *See United States v. Davis*, No. 20-30438, 2022 WL 226000, at *2 (5th Cir. Jan. 24, 2022), *cert. denied*, 142 S. Ct. 2767 (2022) (rejecting defendant's contention that the serious bodily injury enhancement in U.S.S.G. § 2A2.2(b)(3)(B) incorporates physical restraint as a factor and noting that the Fifth Circuit has previously upheld application of the victim restraint adjustment under § 3A1.3 when the bodily injury enhancement applied).

Unlawful restraint of a victim is also not an element of 18 U.S.C. § 111(a). Section 111(a) criminalizes "forcibly assault[ing], resist[ing], oppos[ing], imped[ing], intimidat[ing], or interfer[ing] with" an officer while he is engaged in the performance of official duties. Not all such assaults include physically restraining a victim. As noted above, restraint is principally defined as "'to hold back; to check; to hold from action, proceeding, or advancing." *Taylor*, 961 F.3d at 78. While assault involves some force, it does not necessarily involve restraint. Physical

force is distinct from qualifying physical "restraint." *Id*. at 78-79 (citing *Rosario*, 7 F.3d at 321 ("mere physical contact with the victim does not inevitably amount to physical restraint")).

For instance, in *United States v. Wilson*, 198 F.3d 467 (4th Cir. 1999), the court upheld the two-level physical restraint enhancement for a carjacking, noting that physical restraint was neither an element of carjacking nor "incorporated into the base offense level for robbery." *Id*. at 472 (4th Cir. 1999). Here, after engaging in other obstructionist conduct throughout the afternoon, Mullins purposely grabbed and dragged Officer A.W. to get him away from the police line, to force him into the violent mob of rioters, and to keep him away from the help of his fellow officers. Such behavior, calculated not just to hurt the victim but to trap him, justifies application of the restraint enhancement.

The restraint enhancement has been applied in other January 6, 2021 Capitol riot assault cases where defendants were convicted of 18 U.S.C. § 111 offenses. In *United States v. Thomas Webster*, 21-cr-208-AP.M., Judge Mehta found the enhancement applicable when the defendant tackled an officer on the West Plaza during an assault. Relying on the *Bell* factors, Judge Mehta found that four of those five factors clearly applied. "Mr. Webster clearly used physical force; he exerted control over [the officer] for that period of time he held him down to the ground. [The officer] was in no position other than to comply with that while physical force was being applied. And clearly there was a direct focus on [the officer] for some period of time, so I think that physical restraint applies."   Webster Sent. Hrg. Tr. At 20-21.

In *United States v. Albuquerque Head and Kyle Young*, 21-CR-291-ABJ, Judge Berman Jackson applied the restraint enhancement to Head and Young as they dragged another officer for about 25 seconds out of the Tunnel on the LWT and into the mob where the officer was severely assaulted by others. Even though defendants Young and Head did not restrain the officer for an

extended period of time, the enhancement was nonetheless applied. For defendant Young, Judge Berman Jackson stated at the sentencing hearing that "[h]e used his physical strength and force to exert control over the officer's body to restrict the officer's movements, to hold him back, to prevent him from using that arm…. The fact that he was rendered unable to fend the rioters off for even that short period of time enabled another individual to reach in and strip him, not only of his badge, but his lifeline, his radio.")   Young Sent. Hrg. Tr. At 8-11.

As in *Webster* and *Head and Young*, the restraint enhancement is applicable in this case. Any objection from Mullins should be overruled.

## H.  **SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)**

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    **Nature and Circumstances of the Offense**

As shown in Section II(B) of this memorandum, Mullins' felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the Certification Vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Mullins and his co-defendants started what became a prolonged, multi-assailant brawl, attacking police officers, which resulted in injuries to those officers. Mullins dragged Officer A.W. out of the police line and towards the mob of rioter where Officer A.W. was further assaulted. Not only did Mullins' actions subject Officer A.W. to assault, it left other officers in the police line vulnerable to the mob of rioters. Further, he interfered with another officer's attempts to return to safety, pushing the Officer B.M.'s head and causing him to stumble back into the mob.

Mullins did not end up on the LWT by accident. He had been on the Capitol grounds for

at least two hours by the time he worked his way up to the Tunnel at the LWT. During that time, he was part of the mob that attempted to breach the barriers that stood between the rioters and the Capitol building: first metal barricades, then officers' bodies. He then encouraged other rioters to push further towards the Capitol building, and eventually, into the Tunnel.

The nature and circumstances of Mullins' actions on January 6, 2021 were of the utmost seriousness and fully support the government's recommended sentence of 51 months' incarceration.

### B. The History and Characteristics of the Defendant

Although Mullins does not have a criminal history, his criminal conduct on January 6, 2021 took place over the course of hours, not minutes, and consisted of multiple assaults against police officers, indicating that it was not a momentary lapse in judgment but a series of terrible, purposeful decisions with violent consequences.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Mullins assaulted multiple officers in the midst of a riot and attack on the U.S. Capitol Building and grounds. His actions on January 6, 2021 were the epitome of disrespect for the law. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D.     The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[20] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs in favor of a lengthy term of incarceration. Mullins' actions on January 6 were deliberate and dangerous, and as noted above, his criminal conduct on January 6, 2021 took place over the course of hours and consisted of multiple assaults against police officers. Also, his lack of remorse at any time following January 6, 2021, demonstrates the need for specific deterrence.

### E.     The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007).   As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience,

---

[20] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).   In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021).   Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Daniel Leyden*, 21-cr-314 (TNM), Sent. Hrg. Tr. at 38 ("I think the government rightly points out generally the best way to avoid unwarranted sentencing disparities is to follow the guidelines.") (statement of Judge McFadden); *United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a).   After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and

balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[21]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[22]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.

---

[21] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[22] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide useful comparisons to the relevant sentencing considerations in this case.

*United States v. Justin Jersey*, 21-cr-35 (RC). Justin Jersey, one of Mullins' co-defendants, charged at and attacked the police line in the Archway. Jersey viciously assaulted Officer A.W. by grabbing his face and knocking him to the ground, leaving him vulnerable to attack by other rioters (like Mullins). Jersey eventually obtained a police baton and used it to strike at the other officers in the line. After retreating back into the crowd, Jersey remained in the area and collected the helmet of the officer he had brutally knocked down as a trophy. Officer A.W. sustained serious injuries as a result of the attacks on the LWT, including from Jersey's assault. Jersey's assault of Officer A.W. reignited other rioters' violent assaults against police. For Jersey, the Court determined that the defendant's total offense level was 24 and criminal history category was I, resulting in a Guidelines range of 51 to 63 months' imprisonment. The Court imposed a Guidelines range sentence of 51 months' incarceration.

*United States v. Logan Barnhart*, 21-cr-35 (RC). Barnhart grabbed Officer B.M.'s neck and torso and dragged him in a prone position from the police line, out of the Archway, and down a set of stairs into the violent mob, where the officer was further attacked with weapons, including a flagpole and a baton, and sustained physical injuries. Minutes later, Barnhart returned to the police line in the Archway, where other rioters were assaulting the line of officers by slamming riot shields into them, striking them, and throwing objects at them. Barnhart joined these rioters in charging against the police line. Barnhart then approached the line of officers wielding a flagpole and used it to strike the officers. The Court ultimately sentenced Barnhart to 36 months, explaining that it was varying downward significantly owing to medical issues that Barnhart suffered after he

was arrested in this case and which Barnhart attributed to the GPS monitor that he wore as a condition of release.

Mullins' assault on Officer A.W. is highly similar to Jersey's assault on the same officer and Barnhart's assault of Officer B.M. Each involves officers who were singled-out and pulled off of the police line, separating them from their fellow officers and leaving them vulnerable to an angry, assaultive mob. Further, like his co-defendants, Mullins intentionally maneuvered himself to the front of the crowd, grabbed an officer, and dragged that officer into the mob, where the officer was assaulted. Like Jersey and Barnhart, Mullins engaged with officers multiple times, first, by pushing into the officers' line repeatedly on the West Terrace, then by shoving against the rioters who were pushing against the officers in the Tunnel, then by dragging Officer A.W. towards the crowd, and finally, by pushing Officer B.M. down the stairs. Unlike Barnhart, Mullins suffers from no significant health issues.

## I. RESTITUTION

The Court should (A) order Mullins to pay $2,000 in restitution to the Architect of the Capitol and (B) find Mullins jointly and severally liable for $30,165.65 to MPD, the costs of Officer A.W.'s medical treatment and time off work due to his injuries that MPD incurred on his behalf.

### A. The Court Should Order Mullins to Pay Restitution to the Architect of the Capitol.

As agreed to by the parties, the Court should order Mullins to pay $2,000 to the Architect of the Capitol. The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v.*

*Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Mullins must pay $2,000 in restitution to the Architect of the Capitol, which reflects in part the role he played in the riot on January 6.[23] Plea Agreement ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies in July 2023.[24] *Id.* This restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol. *See* PSR ¶ 132.

---

[23] The government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

[24] This figure does not include damages incurred by MPD, including the expenses referenced in Section X.B below.

**B.  The Court Should Order Mullins to Pay Restitution to MPD.**

In addition, the parties agreed that, under 18 U.S.C. §§ 3663(b)(2) and 3663A(b)(2), Mullins must also pay restitution to "all victims who suffered bodily injury as a result of [his] conduct," including Officer A.W., in an amount to be determined by the Court. Plea Agreement ¶ 12. As reflected in Exhibit 15, the MPD incurred a total of $30,165.65 on Officer A.W.'s behalf[25] that is attributable, at least in part, to Mullins's criminal conduct and his offense of conviction – pulling Officer A.W. by his leg towards the violent mob, where several rioters struck and maced him. ███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████

Officer A.W. may have sustained some of his injuries – primarily the laceration to his head – before Mullins assaulted him. *See* Exhibit 11B, *supra* at 23 (blood, presumably from Officer A.W.'s head injury, is visible on A.W.'s jacket). ████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████ As discussed above, Officer A.W. did not return to work until May 2021 because, as he described it, he "was in no shape to do [his] job" "[p]hysically [or] mentally" after being assaulted on January 6, 2021.  *United States v. McAbee*, 21 Cr. 35 (RC), Trial Tr., Oct. 4, 2023 at 195. ████████████

███████████████████████████████████████████████

---

[25] Under 18 U.S.C. § 3664(j)(i), "[i]f a victim has received compensation from insurance or any other source with respect to a loss, the court shall order that restitution be paid to the person who provided or is obligated to provide the compensation."

████████████████████████████ This defendant – who was one of the individuals responsible for placing Officer A.W. in this traumatic and violent situation – should be held responsible for his share of the damages caused.

Two of Mullins's co-defendants – Justin Jersey and Ronald Colton McAbee – have also been convicted of the same assault on Officer A.W. The Court should impose liability jointly and severally to all three. *See* 18 U.S.C. § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court may make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant."); *United States v. Monzel*, 641 F.3d 528, 538–39 (D.C. Cir. 2011) ("Joint and several liability may also be appropriate under § 3664(h) where there is more than one defendant and each has contributed to the victim's injury.")

### J.  CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of a term of incarceration of 51 months, three years of supervised release, $32,165.65 in restitution, and the mandatory $100 special assessment for the count of conviction

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

*s/ Alexandra F. Foster*
Alexandra F. Foster/Benet Kearney
Assistant United States Attorney

601 D Street, N.W.
Washington, D.C. 20530
Alexandra. Foster@usdoj.gov / (619) 546-6735
Benet.Kearney@usdoj.gov / (212) 637 2260